Good morning, Your Honors. May it please the Court, my name is Emily Jeffers and I represent Appellant Center for Biological Diversity. I'd like to reserve two minutes of my time for rebuttal. Your Honors, this case is about the Pacific walrus. The Fish and Wildlife Service has stated at ER 102 that the walrus's fate is, quote, linked to sea ice. No party here disputes that that sea ice habitat is disappearing due to climate change and will largely be gone by the end of this century. Because this habitat is disappearing and because of the harm this will cause the walrus, in 2011 the Service found the species warrants and protections under the Endangered Species Act. The Service reiterated that finding every year for the next five years. Then, in 2017, with sea ice hitting record lows, the Service reversed course and concluded that walruses should not be protected under the Endangered Species Act. Instead, the Service speculated that walruses may be able to adapt to a new land-based existence. This decision is based neither in the record nor the law. I'd like to spend my time here on two points. The first is that when the Service reversed their 2011 determination that the species warranted protection, the Service violated the Administrative Procedure Act and a basic central tenet of administrative law when they failed to provide an explanation for their change in position. The second is that at the crux of the agency's argument is their belief that the walrus will simply respond, will simply adapt to the loss of their sea ice habitat by living on land. This belief is not supported by the best available science as required by the Endangered Species Act. Ms. Jeffers, let me focus on your arguments for a second because they're slightly different. The first argument is sort of a Fox television argument, a Cade argument, which is that the Service has changed its position but that the relatively short decision document doesn't sufficiently give the reasons so that we could conduct judicial review and figure out why. The second argument is even if they had sufficiently explained, you think the result is arbitrary and capricious because it doesn't match up to the best available science. Is that a fair summary of the two? Yes, that's a very fair characterization. We don't need to get to the second if we agree with you on the first, am I correct? Yes, that is true. This court could find the decision arbitrary and capricious in violation of the Administrative Procedure Act. We could find that the Service in switching its position just didn't provide a sufficient explanation under which a court could take a look and figure out why. Yes, and that's one of the factors in the Fox television test. Another, and so I think that certainly if you reach the point you find that there's no reasonable explanation, you could remand back to the Service to provide one, but another factor in the Fox television test requires the agency's new decision to be valid under the underlying law. And that's why I'm asking because it does seem to me that with respect to the second question, Judge Gleeson did a pretty good job of doing what I think the agency should have done, which was go through the record and piece together the things that might explain its decision. And I'm not sure that if we were to get to the second question, we shouldn't just remand to the agency, even in that case, to explain why it thinks the adaptations and the various things that may have changed since 2011 lead to the conclusion that the Walrus is no longer threatened. So what I was resisting was your notion that if we got to the second question, we would just find the, we would just say this is, we wouldn't remand. Well, I think that it's both. I think we, I think we went on both arguments, both. It doesn't satisfy the Fox FCC test, and it's not based upon the best available science, but there's... You make another argument that I wanted to ask you about before we got too deep into this. You make a procedural argument that says the decision document can't incorporate by reference some other document. Explain that argument to me, because I want to make sure I understand it. Sure. We are not saying that the decision, that the species status assessment cannot be incorporated by reference into the decision document. That's not what we're saying. We're saying that the decision document must provide the explanation for the agency's change. Okay. So let me ask you a question as you rephrase it. What if the agency had a document, and that's not the document in this case, the species assessment, that said, you've asked us to make a recommendation about whether the walrus should remain listed or not. We've gone through a bunch of things, weighed a bunch of things. We're the group of experts, and we recommend that you delist it. And then the agency said, for the reasons in that document, we choose to delist it. Would that violate the Administrative Procedure Act? Well, this court in Center for Biological Diversity v. Zinke found that the service cannot rely on its briefing or any other documents to provide the explanation for why it changed its decision. It said, quote, the explanation must be evidenced from the listing decision itself. Well, I do think that it has to be within the listing decision. Even if it incorporates a document that in effect purports to be make a decision or make recommendation for a decision. Well, Your Honor, it's hard to speculate exactly what that kind of document would be. And in this case, the service acknowledges that ER 143, that the status assessment is not a decision document. Yeah, that's why I asked the question saying that's not this case. But I'm worried about the limits of your position about not being able to incorporate another decision document in the final decision. Well, I think in listing decisions where the agency is always using a species status assessment, I think in listing decisions, the status assessment cannot be that rationale. But as to whether another document in another case that had a sort of different procedural posture, I don't really want to speculate on that. I'm sorry, I may have taken you off track, but I was interested in that argument because I worried that it may go too far, but I'm not sure it applies to this case. Okay. Ms. Jefferson, can I ask you, another point that's made in your briefs is the issue of the relevant time period. Should it be 26 or the year 2100? Analytically, does that sort of fit in what Judge Hurwitz referred to as its first box as to whether the agency adequately explained itself? In other words, are you arguing that on that issue, they didn't explain themselves either? Correct. Not only did they not explain themselves, but the very first factor of the box test is that they have to acknowledge that they're changing positions. And the listing decision doesn't acknowledge that at all. It doesn't mention that they are changing from the 2100 foreseeable future to 26. I'm not sure I agree with that, but I just want to, it seems again, just to go back to the way Judge Hurwitz laid this out, there's sort of two sets of questions here. Again, number one, did they adequately explain themselves? And assuming they did, was it, you know, was it sufficiently supported based on the record that they cited? But once again, if we can't get past that first issue, we wouldn't need to reach the second one. I think that's true, Your Honor. I think that the support did remand to the agency for an explanation. On the second point, on the foreseeable future, had they said back in 2000, what's it, 11? Had they said back in 2011, we can only foresee for the next 50 years, because it's just too uncertain after that. Would that have been an irrational decision? I think that that would have failed for the same reason that their 2017 conclusion failed, because there's not, the best available science doesn't support that conclusion. The best available science demonstrates the harm to the walrus extends to 2100 as that is when we have really solid data regarding sea ice loss and the walrus's response to that loss. But I think that, you know, we 11, well, yeah. Let me ask the question somewhat differently. Let's assume the 2011 decision said, we're going to continue to list the walrus, but we're going to reduce the period, foreseeable time in our previous analysis, because we've just looked at this and we were crazy to estimate a century out. We have no idea what's going to happen over the next century. So we're going to limit it to 50 years. Would that be independently arbitrary, do you think? So if I'm understanding that correct, they would change their foreseeable future to 2060. But yeah, that's the only change from the previous decision. They just changed their foreseeable future from, I guess, was a century. It was to 2100, roughly, to some shorter period of time. Would that be arbitrary and capricious? Your Honor, I don't think we would have challenged that finding. No, I understand, because you would have been happy with the continued listing. I'm trying to focus on that second element to figure out whether the problem is really just a Fox problem or whether it's an arbitrary and capricious problem. I don't, I think it probably would have been arbitrary and capricious, but we would never have brought that case. Your Honor, so I just sort of touched on my first point, which is the APA argument. Now I'd like to move on to my second argument, which is whether or not this court allows the species status assessment to explain the service's new listing decision. And we believe that the court in the Center for Biological Diversity v. Zinke states that the explanation must be within the listing decision itself. The assessment in this case does not support listing. The service decision is not based upon the best available science and is arbitrary and capricious in violation of the Endangered Species Act. The service has reiterated many times over many years, for example at ER 125, that the walrus is an ice-dependent species, yet it now claims there is too much uncertainty regarding the fate of the walrus with respect to climate change and concludes the walrus may adapt to living on land in an ice-free Arctic. There is simply no support for this in the record. The statutory test for designating the walrus as threatened is whether the best available science, even if necessarily uncertain, establishes that it is likely that the walrus, ice-dependent species, will become endangered when that ice disappears within the foreseeable future. Can I ask, the issue of scientific uncertainty is a really important one in this area. I mean, here, if there had been an agency conclusion and it was sufficiently supported that we just don't know what will happen, whether that's in 2016 or 2100, would that have been a valid basis to change the 2011 listing? Your Honor, I think the agency would have had to explain why that explanation, an examination of why they were relying upon one study over another, whereas on this case there, they just make vague claims of scientific uncertainty, and it's very akin to the services actions in the Center for Biological Diversity versus Zinke, where this court overturned the services decision to not list the fish, the Arctic grayling, where the listing decision explicitly cites climate change and its risks to the fish, yet claimed scientific uncertainty as the extent of its impact. This court found that it was not enough of a service to invoke scientific uncertainty to justify its action, but instead must explain why the uncertainty justified its conclusion. Likewise, in Ritter-Yellowstone versus Servine, this court found arbitrary and capricious services conclusion that whitebark pine would not threaten grizzly bears. To the extent you're saying they can't just throw up their hands and say scientific uncertainty is some sort of magic word, I think you make a fair point, but I'm more asking if they had done a significant assessment that we have these studies on the one hand that show X, we have these other studies on the other hand that show not X, they're all good studies, the answer is we don't know, and therefore we're going to reverse the 2011 decision. Could they have done that? Yes, Your Honor. Your position is that they haven't done that? Exactly. Our position is that the service could not change its position in policy, of course. An agency is entitled to change its mind, but it must explain the reason why. But uncertainty, if added to that, uncertainty would be a significant basis in whitebark's mind. Yes, if it explained why that uncertainty justified its conclusion. Sure, your position is it's not enough just to say uncertainty, one must then explain why the uncertainty gives rise to your position. Exactly, yes, Your Honor. Okay, you wanted to save some time for rebuttal, perfectly content to let you not do so, but if you want to, you're running out of time. Okay, I'll wrap up right here. Regarding the service's assertion that the walrus will adapt to living on land, Your Honors, there is simply no support for this in the record. As stated, I think, very eloquently by the scientists in their amicus brief, page 28, there is no scientific basis for believing that the Pacific walrus would be able to readily adapt to the relatively abrupt loss of sea life. The Marine Mammal Commission also states that ER 272 assumptions about the ability of walruses to adapt are just that assumption. Your Honors, I'll reserve the rest of my time for rebuttal. Yeah, you're out of time, but we'll give you a minute for rebuttal. They took you over your time. Ms. Sugar Schmidt. Good morning, Your Honors, and may it please the Your Honors, at the outset, I'd like to make this explicit. This is not a case about whether climate change is real. This is not a case about whether that climate change will impact the ice in the Arctic environment. This is a case about whether the Pacific walrus in 2017 met the statutory definition of a species in danger of extinction now or in the foreseeable future. Well, is it about that? If this were the initial decision about whether the Pacific walrus should be listed as threatened, I think your statement would be accurate, but your agency found that the walrus should be listed as threatened, continued that listing for a period of time, and then shifted direction. So it's not just about whether or not you could have rationally made that decision, but whether you sufficiently explained your change of position. And for me, that's the centerpiece of this case. So I don't doubt for these purposes of argument that if you were approaching this de novo, the agency could have had it sufficiently explained it, said why we've chosen not to list the Pacific walrus at this time. But can you focus on the first point? We've got to, and here's, let me just tell you my concern. We've got a three-page decision document, if you will, that incorporates another document that really doesn't make any decisions, that sort of says, well, some things have gotten better, some things have gotten worse. We've done our assessment here. Agency, you do with it what you will. And of that three pages, really only one page is devoted to the change. I mean, the other part of it's about the foreseeable future. And the way I read it, it says, well, some things have gotten better, some things haven't, we're uncertain about some things, and so we're taking it off the list. And I'm not sure how I can review that decision. So help me understand why that decision document is sufficient for us to conduct APA review. I think, Your Honor, because what the decision document says is here are the concerns that we have about the walrus, and here are the concerns that we no longer have about the walrus. And most importantly, here is the new information that's become available to us over the past six years since we first took a look at this issue. And that's the crux, right? Fish and Wildlife Service is supposed to look at this as an iterative process, where every time new information becomes available, it incorporates that information into its decision-making. And that's exactly what it did when it was making this 2017 finding. How can I tell from the decision document how it weighed those factors? What seems to have gotten better, if you will, is this notion that there's less hunting than we thought there might be. And we think they might adapt to land. On the other hand, you've got the fear that once they're on the land, they're going to be easier for hunters to find. You've got the continued ice flow issue, which you don't say has gotten better. It's probably gotten worse because we have more climate change information than we did back then. And you've got information that their prey is more distant, although there's some information that they may be able to travel longer distances than you thought. And what I can't tell from all that is how you put all those facts in a mix and said, well, that means they're no longer threatened. So tell me how I can look at this document and from reference to various facts, how they're no longer threatened. Right. So I think the first place is you have to start with what is the definition of endangered species, the threatened or endangered species. It's a risk of extinction now or in the foreseeable future. So the first thing we have to do is determine what the foreseeable future is. And as we know from the M opinion from 2008, the way we define a foreseeable future is to look at what threats exist, what those threats are likely to do, and crucially, what the species response to those threats is likely to be. And if you reference back to the SSA, you can see that the Fish and Wildlife Service went through extensive modeling efforts and data collection efforts to look at all three aspects of those. And in particular, what new information was available about how the species was responding to things in its habitat. And we're seeing some evidence about it. Let me pose the question somewhat differently, because and I said this to your friend. I think Judge Gleason did a great job of putting together a decision document. She went through the record. She took stuff out of it. She explained how it might rationally lead to a conclusion. And I think you're doing a great job of telling me how a decision document might have been structured. But focus on this document. How can I look at this document and get that from it? There's lots of stuff in the record that might have led to the kind of document you're describing, but I'm not sure this document meets that description. Tell me why it does. Well, for example, Your Honor, talking about the foreseeability issue, right? If we look at the decision document, this is excerpts of records from the plaintiffs at 194, it specifically includes language like, therefore, while we included projections up to 2100 in our analysis, we considered 2060 as the foreseeable future timeframe for this analysis due to future changes in suitable habitat, coupled with the impacts for other stressors, right? So the decision document does, in an overview way, talk about these things wildlife service was concerned about and in detail and status assessment. I think the difficulty seems to be that the assessment, when you read it, you know, sort of cover to cover is sort of telling a mixed story. It seems that on the whole, the conclusions were that things are maybe looking slightly better, or there's reason to think that things could be better than we thought originally. But on the other hand, there's plenty of red flags and risks. And the actual decision doesn't really work through those in any meaningful way. That's, I think, the difficulty with at least my read of these agency documents. I suppose two points by way of response, Your Honor. The first is that's why the species status assessment was incorporated by reference. It's not a decision document, as it says, but the evidence within it, the data analysis within it, was incorporated within this listing decision, so that you could use that as context when evaluating this one. Not a listing decision, but a multiple finding. Only in a very personal, in a very wholesale way. I mean, there's a couple of references in the listing decision. Let's say you're in the 2017 decision that say, you know, see the assessment breadth higher than the entire document essentially incorporated without identifying what particular portions of that document the agency has found more relevant and more persuasive. I mean, the brief tries to make that. But it doesn't do that. Well, Your Honor, my second point then would be that I think that the test here, the lens at which this court is looking at doing this evaluation, is not to say, is this petition finding a model of clarity regarding, you know, demonstrating the reasonable discernible. And I think the fact that this court is acknowledging that both Judge Gleason made that conclusion and that our briefings have indicated that means that it's a very, at bottom, it is at least reasonably discernible from what's in front of you in the finding and its references to the SSA that the agency made this decision with a reasoned explanation. Well, but that goes to the second, it seems to me, the second part of the argument that your friend is making, which is, was it arbitrary and capricious? I guess I'm focusing on the first part. Your agency made a reasoned decision 10 years ago that the Walrus should be listed. You're now changing position. And the case law tells us you got to explain why. And so that we can figure out whether that change is arbitrary and capricious. And my concern is that the couple of things have changed. Some things are worse. Some things are better. We have this assessment, which when I read it, if anything, convinces me that it still should be listed because the experts are all worried about the Walrus. Put aside foreseeable future for a second. So I'm not sure I can tell from this whether or not your change in position was just because you changed position or because how it was reasoned. But focus on this document and about one page that tells me why you've changed your position, not foreseeable future. And tell me where I can find the explanation. Right. So I'd say I'd point you to say ER 194, where it specifically starts. This is right, the finding paragraph. And it says, we conclude that while the Pacific Walrus will experience a future future reduction in availability of sea ice, et cetera, et cetera, we are unable to reliably predict the magnitude of the effect and the behavioral response of the Walrus to that change. And that's important because the ESA places in a burden on the Fish and Wildlife Service to make this finding. They can't make a listing decision just because, well, we don't know any better. We don't have evidence. We're too uncertain or whatever, whatever else it might be. It has to be able to reliably predict that a species will be in danger of extinction. Right here. And does the document explain why that uncertainty supports the conclude supports the conclusion that the Walrus is no longer threatened because you had once previously made a decision that it was. And our case law seems to say, as we were discussing with your friend, that you can rely on uncertainty, but you have to explain why it supports your position. So why does the uncertainty support the change in position here? Because here what we're uncertain about is the fact that we're seeing adaptive capacity. It's not an open question of, well, we're uncertain about whether or not there will be some adaption. We're actually seeing, and these are not sort of, you know, large scale genetic changes, but we are seeing behavioral adaptations of the Walrus to its changing environment. I just want to highlight the fact that that's a good thing. That's what we want to see coming out of, you know, species reaction to habitat change. The alternative is not good. And so when we see this positive adaptability, even though it's in response to environmental change, that's what this listing decision or this decision finding notes in coming to the conclusion that, well, we know that there are going to be some negative threats. We know that there are going to be some stressors. At the same time, you're seeing evidence, actual evidence. For example, in the SSA, it's ER 148, there's a full discussion of at least three or four new studies that came out in between the 2011 and the 2017 findings that talked about adaptive changes. And that makes us say we can no longer reliably predict that the species will be at risk of extinction because it may continue to adapt in a way that it's not going to have that outcome. Let me ask you, why wouldn't you say that? Why wouldn't the administration say that we have seen improvement or adaptability and that allows us to make these other judgments? They fall back on that very conclusion that you're arguing. Therefore, there should be a change. That is the argument, Your Honor, that we are seeing evidence of adaptive capacity and that evidence in conjunction with seeing reductions and stressors that were of concern in 2011 means that this species does not or did not, with the evidence in front of the agency in 2017, justify a listing as threatened or endangered. And I think if you look through the sections of the SSA that deal with that adaptive capacity, it's really clear that there is affirmatively evidence that the species is changing its behavior in a positive way that indicates it may be able to continue to adapt to these changes in its environment. So let's assume the fact of the adaptation for a moment, which I take it is really that they're beginning to live on land rather than on ice floes, right? In large part. Why does that reduce the threat to the species? Because the question, Your Honor, isn't ultimately whether there is some threat to the Pacific walrus. That's not the standard that we're looking at here. It's frankly not the question of whether, you know, the ESA standard is not, will some species have some level of population decline at some point in the future? It's, is this species at risk of extinction now or in the future? And I understand this is not the most sort of empathetic seeming line, but there is a distinction there. So the question is, are the threats facing this species sufficient? Let me rephrase the point because I want to get back to what Judge Corker was asking you about. This is a, this is obviously not a complete summary, but at least in 2011, you said, we're worried about the ice floes disappearing and therefore they'll lose their habitat. In 2018, you say, well, luckily it appears that they're going on to land. Now we're uncertain about whether or not that, what that will mean about their long-term future. Why is that enough to now take them off a threatened list? I mean, if you're, if there's, if you're still uncertain about what it will mean about their long-term future, isn't that a good reason to keep them on the list? Well, two answers to that, Your Honor. The first is that the alternative to them moving to land would be perhaps something like just dying. So there's clearly an alternative there that would have been a lot worse than the adaptive behavior that we're seeing. So the adaptive behavior is a positive thing. I take your point that things are better. My question is, how do I reach the conclusion that they're no longer threatened? Right. And so this, the second element there is that, that if you actually go back and look at the three factors, and I think Judge Gleason did a very nice job of this, the three factors that the service found were of concern in 2011, which were modification of habitat, over-utilization, and inadequacy of existing regulatory mechanisms, the service also identified declines in those of stress, as stressors. So we're seeing a dual thing where we're seeing certain things that the service was concerned about in 2011, like over-harvest and over-utilization as a portion of the population. And we're seeing those decline. And then we're seeing positive changes like the adaptability go up. And I think what's important is that those are, those are scientific judgments and they're complicated. And certainly people may disagree, but the fact that the service didn't come to, you know, CBD's ultimate preferred conclusion about how to weigh that evidence is not a reason to override the Fish and Wildlife Service's careful judgment on this issue. Thank you. We'll put a minute back on the efforts for rebuttal. Thank you, Your Honor. I'd like to contest first the service's contention that their rationale is reasonably discernible from the face of the listing decision. Listing decision does not give the reader any understanding of the facts upon which the service based its new decision. It is bereft of references to the scientific literature. It does not really wrestle with the question of what has changed in the science of Arctic response to such a change that would warrant a completely different listing. What the service here points to to defend its changed position is not articulated in the decision itself, but it's cobbled together by cherry picking from various record documents, including the species status assessment. This court has clearly stated in CBD v Zinke that that's not allowed. The second point that what the behavior modifications that the service points to are not necessarily a good thing. Those are exactly the behaviors that this court found warranted listing in 2011. Just because the Walrus is doing everything it can to survive does not mean it's adapting to a new environment. That's a fundamental misunderstanding of adaptive evolution. I see I'm out of time. Thank you, Your Honor. Thank you. Let me thank both sides for their excellent briefing and arguments in this case, and this case will be submitted.
judges: Hurwitz, Bress, Corker